And we will hear argument in the last case of this session, and that is United States v. Iniguez. Counsel, you may proceed. Your Honors, good morning. Gary Burcham for Appellant Cruz Iniguez. I would like to start with the first issue in this case, the wiretap. And the starting point for this court with the wiretap issue is to first determine whether the affidavit submitted by Agent Garcia was a full and complete statement concerning necessity and the state of the case at the time of the application. We say it was not. We're not alleging that this was an affidavit that contained solely boilerplate language or did not touch upon the facts of the case at all. It certainly did have a discussion about what had happened in the investigation up to the point of requesting the wiretap. The problem with the affidavit submitted by Agent Garcia were the material omissions that we now know exist based upon his interview with the B&E personnel, which is set forth in the B&E report from June 5, 1998. While the affidavit from Agent Garcia went into some detail concerning who the suspects in the investigation were, what results had been gained from the PIN registers and trap and trace placements, what had happened with the confidential source in Boston, it omitted a substantial amount of information that was set forth in that B&E report from June 5, 1998. It did not list the names of at least a dozen co-conspirators who had been identified up to that point. It did not mention four physical addresses that had been tied to the stash house on Parton Street. It did not mention at least five suspected source persons from the Castellan organization. And from NFBI 302 in March 1998, it did not identify Pedro Iniguez as a person who was suspected of being part of this organization. So while the affidavit did detail some of the details that had been discerned concerning this organization, it left out extremely important details which we only know about because Agent Garcia spoke to the B&E about a month earlier. Okay, what is the standard that we have to apply in reviewing the affidavit? The standard for reviewing the affidavit as to whether it was a full and complete statement is de novo. And then once the court makes that determination, it goes on to the next step and looks for necessity. Well, I'm also looking at the ingredients. What is the showing that you have to make to establish that the affidavit was improper or insufficient or what have you? If we can establish that the affidavit on its face was not a full and complete statement, I think the court needs to make a de novo review of necessity. The government likely will argue that it's an abuse of discretion standard that takes place in the secondary analysis. But I think when we have an affidavit which is not a fair representation of the state of the investigation at the time the affidavit was submitted, I think... And your position is it's unfair because it's incomplete rather than misleading? Exactly. And once the court fills in this additional information into the affidavit, the de novo review is proper to look in the totality of the circumstances and to determine if indeed necessity was present or not. With respect to necessity, I'm not going to sit here this morning and say what should have been done. I can just go briefly through the different reasons the government submitted that the wiretap was necessary. The first one is they say the organization was tight-knit and they're not able to identify members or the scope of the organization. As I just stepped forth, they had more than a dozen members in addition to their own targets who had been ID'd prior to the application for this wiretap in June 1998. They talk about the limited utility of the confidential source. He identified the leader of the organization, Cruz Amigas. They say that the CS can't get into the organization and help them determine the players and especially who's at the top of the organization. When he called up Santa Ana, he was speaking to Cruz Amigas on the telephone, and Cruz identified himself as such. And so the CS absolutely was able to get into the organization and to the upper echelons of the organization and find out who those people were. They said they could not learn where the drugs were stored. Well, we have four additional stash houses which, as far as I know, were never surveilled by anyone related to this case. We have the knowledge of the government as to where the actual center of the organization was, the 202 or 205 apartments on Parton Street. There's no evidence that there was any surveillance on the other stash houses. There's no evidence that there was ever any surveillance with respect to following the Amigas brothers or the other gentleman from the Parton address to wherever the drugs were held to deliver them. They certainly could have set that up themselves. There's an allegation it was too dangerous. There's no evidence whatsoever in the first affidavit concerning danger. They're talking about the limited utility of the PIN register as a trap and trace. They were able to identify numerous phone numbers, numerous addresses from the PIN registers, again, four of which were never surveilled, as far as I know, based upon the record. They talk about the limited utility of physical surveillance. They put a camera up looking at the front door. I don't expect them to be able to or expect to be able to put up a camera and see people carrying kilos of drugs in or out of the apartment at Parton Street. I think we need to take a reasonable look at what could they have done, follow persons leaving the apartment, traffic stops to search vehicles. Maybe they could have done that, but I read the affidavit as saying, at least in their judgment, that these locations made this difficult in terms of how they were configured, the lack of traffic, that sort of thing. So wouldn't we just be second-guessing, I mean, whether the law enforcement should have done something else when they've given us reasons for why they felt that the physical surveillance was limited and for why, because of the nature of the family interlinking, that it was, you know, the wiretap was the only way they were going to get at the kind of evidence they wanted. Would we really be substituting our judgment for the district court and the law enforcement? Were we to adopt your position? Well, I think that certainly the wiretap was the most convenient and easiest way for the B&E or the FBI to crack this organization and make their case, certainly. And we know that's always true, but. Exactly. And they do have to, but that's why the statute makes you provide more than that. Exactly, and the question, was it necessary? I think we don't go out on a limb if we say, well, they could have done A and could have done B, if those are things that are normally done in the course of an investigation. I'm not saying that they should have done extraordinary things and taken extraordinary risks. I'm just talking about basic law enforcement techniques, which were not employed based upon the vast amount of information they had prior to asking for this first wiretap. Counsel, if you're finished on that point, we do have this cross-appeal, and I just hope you will devote some of your time to that. I'm prepared to go right there now, Judge. The district court imposed a sentence of 360 months in custody and explicitly stated on the record that it believed it could not impose any more time than that because the stacking of the counts was limited to the low end of the guideline range, which was, again, 360 months to life. We certainly agree that the district court properly interpreted the law of the circuit concerning stacking and, more specifically, what the term total punishment means. The government argues that total punishment means any sentence within the applicable guideline range that is properly determined by the court. Unfortunately for the government, the law of the circuit says very differently. The only case you cite in the law of the circuit, I have trouble knowing what the law of the circuit is. It certainly is somewhat unclear, but the only case that directly addresses this exact question is Archdale. The government cites a host of cases, Moreno, Hernandez, Palomba, Kintz, Jotsky, where a sentence above the minimum of the guideline range was imposed, but there's no reason to believe that this exact issue was ever presented in those cases. Just because this court affirmed a sentence, a mid-range sentence, in which consecutive sentences were stacked to go above the minimum of the guideline range, does not mean that this exact total punishment question was raised. Could you help me on something? You know, I think we're all in the same boat here on these different cases. Right. Okay, so I want to go back to Archdale because that's obviously a key case in your argument. Yes. Help me out here. The guy had two counts with a maximum one of 180, one of 24. Correct. Which gets you to 204 max. Correct. So would you agree that under any circumstance the court couldn't go above 204? I mean in terms of the maximum. Absolutely, yes. And they were using the minimum of the range, right? Well, the range was actually higher than that. Okay, now let me finish. I want to keep going because there's a kind of sequence to this. So you can't get any higher than 204. Right. So in a way, I wonder why that's not the end of the story because the range is 210 to 262. Correct. So what does that matter? Well, in that case, factually, the statement by this court was not necessary to the sentence that was addressed in Archdale. Okay, so now, you know, I always hesitate to say something is or isn't dicta because you're kind of skating on thin ice. Right. This one seemed pretty clear, just like you said, that this definition of minimum was kind of irrelevant in Archdale. So I'm wondering why we should take sort of a little phrase in Archdale as being the controlling law. Well, first of all, because in Minone, excuse me, Minore, that was followed. It followed Archdale and gave the same definition of total punishment. But I guess my best answer to Your Honor's question is that it is the only definitive statement from this court regarding what total punishment means that we have to use. Again, the government has cited a host of cases in which their interpretation of total punishment is followed in that the sentence was affirmed or the district court imposed the sentence. But again, questions which merely lurk in the record, but may or may not have been decided by a court, should not be relied upon at this point to form the basis for defining total punishment. And again, the only definitive statement from this circuit concerning what total punishment means is from Archdale. And even though it was not particularly necessary to the decision in that case, it unequivocally says total punishment means the low end of the guideline range that is found by the court. So what do you do with Jetski, which is sort of the classic case on the other side? With Jetski, I would say the same thing, that the court never addressed this exact issue in that case. In Jetski, the court imposed or affirmed a sentence that went above the low end of the guideline range, but there's no evidence that this exact issue was ever raised by the litigants in that case and was ever decided by the court. And so Archdale, as followed by Menor. Okay, but just so I understand your position, as Judge McKeown mentioned, 204 was the maximum anyway. Correct. So what is the significance of that passage that you're relying on? I think it's this court explaining basically the scheme of stacking altogether just because. It makes no sense to me. You know, sometimes the sentencing guidelines don't make any sense, but maybe help me out on this. If the maximum punishment that you could get is less than the guideline range, isn't that sort of the end of the story and you don't need to engage in a stacking analysis? Maybe I'm wrong on that. Do you see what I'm saying? I'm trying to understand. If you were the trial judge in Archdale, forget all the cases. You're just trying to read the guidelines and you're trying to look at the statutory maximum. Would you just say, well, end of story, I can't go, you know, the government can't come in and say give him 210 or 262. Right. Because you would say. It's above the maximum. It's above the max. So, well, forget the guideline range out the window. If you want to give them the max, you can. You can give them less. You know, you would try to argue for some. Of course not. Of course not. But, you know, I'm sure there's some departures, downward departures available here. I'm not sure anymore, but there used to be. You would have said, you know, you definitely can't give them above 204. So would you have even gone to this guideline of G12D to make any argument? Well, certainly the court stacked the sentences and the sensitive and post-consecutive sentences. It didn't get as high as the guideline range was. But, again, I think this court went out and gave it a discussion about exactly how this complicated stacking system works. And as part of that discussion, it said, well, this is what total punishment is. And even though it didn't come into play in that particular case, it, again, unequivocally said, this is what we understand total punishment to be. And I think we should not discount that part of the explanation by the court. I was wondering, then, about your discussion on Jetski, because it might be a little too quick to say that Jetski didn't deal with total punishment because they typed the sentencing guideline rule that we're talking about, and they used the words total punishment, and then they say this guy's sentence was within the guideline range. And so, you know, he got 65, I believe. Correct. And he could have had 51. Right. It went higher than the minimum. So higher than the minimum. But they're basically saying within that range, that was okay for the judge to give him the sentence. Correct. Why isn't that a discussion and a definitive statement of the relationship between the sentence chosen and the sentencing range and total punishment, because they talk all about that. Again, I go back to the point that I don't believe this particular issue was raised in that case. I think that in that case, they were looking at an alternative argument by the defendant, and no one ever said in that case, hey, the total punishment only means the minimum of the guideline range, and you can't give me any more than the low end of the guideline range. That was not raised in Jetski. And so I believe, again, while there are several cases where above low end sentences have been affirmed by this court, the definition and the meaning of total punishment have never been squarely addressed until Archdale and has followed the next year in the Menor case. And so certainly if the court wants to infer that it was addressed, it would favor the government, I don't think the court can do that. I think the court needs to go with what this court has said, and the only unequivocal statement concerning total punishment comes from Archdale. May I reserve my final three minutes for rebuttal? Thank you. We'll hear from the government. Thank you, Your Honors. I'd like to spend a brief moment. Counsel, would you identify yourself for the record, please? Good morning. It's Linda Awatt. I'm an AUSA from the Central District of California. Sometimes I get too excited. I'd like to briefly address the necessity argument raised by counsel. With regard to the full and complete statement on necessity, the requirement is that the affidavit provide information as to the attempts that have been made, why they've been tried and failed, or why they reasonably appear to be unlikely to succeed if tried or too dangerous. I don't believe there's any case in any court that would require that an affidavit contain every single surveillance, every single person that was identified as being somehow associated in some way with the targets of the organization. And what the B&E report contains is loose links to locations that may have been put together through pen register information, but the B&E report does not contain, contrary to defense counsel's argument, the identification of any additional stash locations that were not identified in the affidavit. The affidavit identified two suspected stash locations, one at Apartment 202 and one at Apartment 205 at 1014 North Parton Street. The B&E report says that Agent Garcia, or actually it says that the pen register information shows that certain residences have been linked to suspected stash locations, but the B&E report read carefully provides no evidence that there are any other suspected stash locations. So that is completely an inaccurate characterization of the B&E report. Furthermore, the B&E report does not contain any evidence that anyone mentioned in the B&E report is a suspected source of the drugs that the Amigas organization was distributing. It only was learned after the wiretap, and the evidence exists after the wiretap, that we found out the Castellanos were in fact a major drug supplier to the Amigas organization. So there was no material information omitted from the affidavit. There's a number of suspects named, and you'll notice that none of them have been, except Cruz Amigas, were indicted in the Cruz Amigas indictment. Defense counsel said that the B&E report identified Pedro Amigas, but didn't identify him in the affidavit, and in fact the B&E report does not mention Pedro Amigas. It mentions other family members, Cruz Amigas, Miguel Amigas, Teodoro Amigas, Laura Amigas, Gerdardo Amigas, and it just says that these individuals include the primary suspect and other people. These are family members of the Amigas organization who are suspected of narcotics trafficking. It doesn't say what kind of trafficking they're involved in, when it occurred. I don't know, maybe they have prior records. But the B&E report does not say that these people are involved in the, and even if it did, do we have to name every suspected drug trafficker that these people are associated with? I don't believe so. It doesn't move the ball to list everybody that you're aware of that's associated with a drug trafficking organization. What the affidavit did is it targeted certain individuals, certain numbers, listed those, it explained what investigation had been conducted to date and why that investigation had not been successful in achieving all the goals in the investigation. For example, the use of a C.I. They had a C.I. from Boston that was thoroughly explained. His name, his nickname actually was Boston, and he was able to purchase drugs from somebody he knew only by the name of Cruz, he didn't even know his last name, and he provided this number to the authorities, and with that number they were able to set up a drug deal with Cruz. But Cruz, he never even saw Cruz. Cruz sent a drug runner. So the extent that this C.I. could help us was in a limited way to talk with Cruz, set up drug deals, and then have drugs delivered by drug runners. So this particular individual was not going to lead to the dismantling of the entire drug organization. He was helpful in getting, you know, the start of the investigation. He was extremely helpful, but he wasn't going to dismantle the drug organization. He wasn't going to lead to our stash houses. He wasn't going to lead to the drug proceeds. He wasn't going to lead to evidence that's sufficient to convict all of the members of the organization by reasonable doubt. They attempted to have an undercover agent do a drug deal, but Cruz Indigas sent a drug runner to try to see if they even knew who this guy was. Now, of course, the undercover agent had never met these people, so they just allowed him to go to the location. They didn't actually meet up with him, but they later conducted a traffic stop, which is another investigative technique that was used in this case. They made the traffic stop. The guy didn't have any drugs on him, and he wouldn't cooperate. He claimed he had no knowledge of any drug trafficking activity. So making traffic stops, interviewing the associates of the drug organization, didn't appear that that was going to be fruitful either. In addition, this organization appeared to be family-run. Cruz Indigas, in conversations with the C.I., had mentioned that he was going to be sending his cousin on one occasion. On another occasion, he mentioned that he was going to Mexico, but this guy could deal with his brother, and he could get the same drugs through the brother that he could get through him. So it appeared that this organization was very leery of people who they didn't know, that they were a tight-knit organization run by family members, and so it was not going to be feasible to get an undercover agent involved in the situation. In addition, Cruz Indigas was previously arrested on a drug charge, and he had a loaded weapon on him at that time. He had a loaded firearm in the commission of another drug felony. So there was reason to believe that there might be danger introducing an undercover agent into this organization as well, but quite frankly, I don't think they could have done it. They tried. The cooperating individual was only able to purchase drugs and ultimately receive them from drug runners, and there was no reason to believe that even if the C.I. was able to introduce an undercover agent, that he would be allowed to get into the leaders and the supervisors and get any more information than the C.I. Boston was able to obtain. There were search warrants executed that are listed in the affidavit, and there was one in particular where a half a pound of cocaine was seized, and again, arrests were made, but those people that were arrested would not cooperate and denied knowledge of any drug trafficking activity. There was surveillance, but the affidavit explained how surveillance at the suspected stash locations was made difficult by the location and the fact that it was a gated complex, and they did use a poll camera. I mean, they used a lot of techniques in this case. They used a poll camera, and they saw people coming and going from these apartments, and in fact, they learned through the poll camera and pen register information that the organization had moved their operation from apartment 202 to apartment 205. So the camera was helpful. It provided some information, but not enough to dismantle this entire organization. Pen registers were used extensively, and the affidavit went into a lot of the pen registers that were used. It didn't list all of them. Some of them are mentioned in the B&E report, true, but that information would not have obviated. If you included everything that was in this B&E report into the affidavit, that would not have obviated the necessity for the wiretap. It just would have provided more reason for the wiretap because nothing in here, you know, they just mention links between numbers. They don't use speakers. I think we understand your argument on that point. Okay, thank you. I think we have this very difficult question. Yes, I'd love to move to that issue. We're trying to get our hands around this guideline. This was my favorite issue in the case. Because Archdell, as the court, I think, instinctively can tell, had nothing to do with the situation that we have present here. Archdell's maximum, I mean, here you've got a guy who's getting maxed out on the statute, okay, but the court goes on to say something about the guidelines, which don't apply in that case. In this case, like the other cases prior to Archdell, the court was facing an issue of whether or not consecutive sentences could be imposed when the count carrying the highest statutory maximum falls within the guidelines in Jateski and Palumbo. Let me ask about Archdell just to make sure I understand how these guidelines work in this case. Yes, Your Honor. He has 180 plus 24. In order, you do have to, I guess, stack them in effect to get to the 204. Right. Does the court, the district court, need to look to any specific sentencing guideline to do that stacking? In other words, how does the district court know that it can stack and can't just stop at 180, which is what Mr. Archdell had hoped for? Right. In every sentence, the sentencing court must look to two factors, the combined offense level, and you go to Chapter 3 to calculate what the combined offense level is going to be on multiple counts. And once you get that combined offense level, then you go to the criminal history and calculate that, and then you go on the chart. Right. And so, yes, in fact, the court would have to look initially at the guideline range because it would have to So Mr. Archdell, the guideline range was 210 upward. It was above whatever the maximum. So the court would have to, in a normal case, the court would say, okay, here's my guideline range. What do I think the appropriate sentence is? Right. And then he goes to say, how do I get there? And in this case, they couldn't have gotten anywhere within the guideline range, even by maximum. Right. Just to fill that out. So then my question is, for the court to say 180 plus 24, it doesn't need to go to any sentencing rules other than to simply look at the statutory max? Well, it has to make sure that the guidelines would have allowed Essentially what the cases have been holding is that once the court determines what the appropriate sentence is, it then needs to see if it has enough statutory maximums to get there. And if it can't get there, it needs to stack the sentences as many as it can to try to achieve the sentence that was contemplated under the guidelines. Right. And in this case Here, I guess my question is simpler than that. It figures out the guideline range. Then it looks and says 180 plus 24 is below that. Right. Kind of end of story. End of story. But is it absolutely clear that they can stack 180 plus 24? That is absolutely clear, because the court would have If the court has to find a sentence within the guideline range, and in order to get there, it has to stack the sentences to try to reach that. And if it can't, then it just has to stop.  Where does the stacking Okay. What happens is In your stages Okay. Under the multiple count grouping and calculation, you take the offense level for the first count. Let's say there's two counts. And let's say you come up with a 38. Okay. And let's say you come up with a 36 for the second count. Then you go to Chapter 3, and they add units depending on how far apart the sentences are. And let's say you get one unit added, because I don't know the rules off the top of my head, but you have to come up with one offense level. So no, the stacking doesn't come into play yet. Once you calculate that ultimate offense level for those offenses, those group of offenses, then you have an offense level and a criminal history. Then you determine what within the guideline range is going to be the sentence. And then you look to the stacking provisions of 5G1.2 to determine if you need to stack the sentences in order to achieve the total punishment that the court wants to impose in that case. And that's how the And, in fact, it's Buckland that does a really good example. Is that done in 5G1.2 then? The stacking is 5G1.2. Correct, Your Honor. So you don't get there until after you've done the multiple count calculation in Chapter 3, until after you've done the criminal history category calculation, and you have one offense level and one criminal history category, and you've determined what the offense guideline range is going to be, and then you pick, the court picks the range, and then, and only then, it goes to Chapter 5G1.2 and determines whether it needs to stack sentences to achieve what it believes is the appropriate sentence within the range. And you're only permitted to stack to achieve the Up to Up to the sentence you've chosen. Right. In the guideline. But it's the court's choice. Yeah. This proposition As to which count and that sort of thing. Right. Because some of these could be reversed on appeal, for example. So you have to get it in the right box, and you can't have too many months in the box, I guess. So you take the maximum on one count, and then you stack upwards to reach somewhere within the guideline range that you've chosen to sentence the defendant on. Exactly. Okay, so then, that's what they did in Jetski, and that's what they did in Moreno-Hernandez. And in Palumbo. And in Palumbo. But, speaking of Buckland. And in Kentz. And in Kentz, which was decided after Archdell. Right. But in Buckland, in Minori, they talked about a possible apprendi error in Buckland, and then looped back to Archdell and said, well, we have 145 months, and he served six. So that gets him to 151, and that's the lowest in his guideline range. And therefore, they make a comment at the end, the court couldn't have gone any higher than that because 151 was the lowest. I'm not sure the court said that, Your Honor. I'm just wondering, I guess we have two cases, Minori and Archdell. Well, Minori cited Archdell. Minori, I think, just followed suit. The court in the lower court, the district court in Minori, that if sentence would be 151 months minus the six for the time he served someplace else. The district court, the only thing Minori did was affirm that court's choice. It didn't even have to cite Archdell. It didn't have to say that the court did the right thing because he sentenced him at the low end of the guideline range. The district court chose the sentence he wanted to choose. Plain and simple. The court in Minori was just citing back to Archdell saying, okay, well, this is, I guess, the law, so I guess the court did it right. But interestingly enough, what would have happened if the lower court in Minori would have sentenced him to higher than 151 months? Then we would have had this issue. So Minori didn't face this issue. Archdell didn't face this issue. The only cases that face the issue in our case have ruled in favor of the government's position. All the cases prior to Archdell, all the cases after Archdell, including Kent's, and also every circuit that I've checked, and I went last night and checked additional circuits and I found some additional ones that are consistent with the approach in Juteski, Palumbo, Kent's, and I think consistent with Buckland. Now in Buckland, they happened to be at the low end again. The judge in Buckland, the district court, just happened to sentence him at the low end. That was it. That was the judge's choice. Nothing in Buckland indicates that that panel would promote the idea that the district court judge was bound to sentence at the bottom of the guideline range. So what do we do with Archdell, which does have a nice quotable passage on this topic? Archdell has a nice quotable passage with regard to definition? Well, so does Juteski, actually, because Juteski — Our question is where does Archdell fit in terms of the jurisprudence of the circuit at this point? Is it something that perhaps we should try to get resolved in bank, or are you comfortable with the idea that that was entirely limited to its facts and we can proceed notwithstanding that language in Archdell that you always go to the minimum? Absolutely, Your Honor. Absolutely what? I think that we need to proceed. We need to do the right thing in this case. We don't need to go along with — Well, the counsel reasonably relied on Archdell. I mean, there's language in there that clearly supports his case. But the district court could not have reasonably relied on Archdell, given the prior precedent. One three-judge panel cannot — Well, then, therefore, your argument then is that Archdell is inconsistent with the rest of our cases. I believe Archdell's dicta, because the court provided absolutely no reasoning for its conclusion that the definition of total punishment equaled the low end of the guideline range. In fact, it was inconsistent with prior precedent in this circuit. It's inconsistent with the guidelines commentary, the first comment. Well, it wouldn't be dicta just because they didn't provide a reason if it was central. I'm getting to that. And it was not central. In fact, it wasn't even relevant to the court's decision. So not only was it not relevant to the court's decision, they provided no reasoning. It wasn't necessary to the decision. And it conflicts with prior precedent of the Ninth Circuit, which squarely talked about total punishment. They say in Chetesky — they say — I want to get the exact words. They say the sentence chosen by the court within the guideline range called the total punishment. Now, they didn't use the word definition. But called, to me, says this means total punishment. So Chetesky clearly provided a rule of law which didn't even need to be followed in Archdell because they didn't need to get there, but Archdell didn't need to get there either. Well, you mentioned — I've seen some other circuits, but maybe you could just — Okay. — tick off the ones that you found so that we can consider all this in our consideration. We've got the Second Circuit, which is the Loeb case, which we did cite. The Fifth Circuit, which is the Kings case, which we did cite. The Eighth Circuit, which is the Arvasti case, which, by the way, was also cited in Buckland. We've got the Tenth Circuit, which is the Nelson case, which we did cite. And then quickly I did some research and found some 2003 cases from the First Circuit, the Third Circuit, the Fourth Circuit, the Seventh Circuit. And I was looking at a case from the Sixth Circuit, but I didn't get a chance to finish it before I came here today. You did a lot of search on 5G1.2. We'll pick those up by today. Yes. I did a search on — You didn't find any cases that would adopt what you claim is dicta of Archdell? No. At most, there would have been cases where the court, again, had sentenced the person at the minimum of the guideline range. And the court may not have discussed what total punishment means. But in the circuits that I just mentioned, they explain — And the way I did my search was total punishment in quotes within a paragraph of 5G1.2, open paren D, closed paren. And I found about 178 cases, some unpublished. The ones that I just — the ones I wrote down here are published cases. All right. Well, thank you very much, counsel. Your time has expired. Thank you. Mr. Burcham. Burcham. Burcham, right. Mr. Burcham, you have some reserved time. Briefly, Your Honors, Your Honor is exactly correct with your interpretation of Menor. I'll read a brief part of the paragraph to exemplify that. Buckland also endorses an alternative ground on which to hold that China Watt's substantial rights were not affected by the district court's Apprendi error. Even if China Watt were subject to only 60 months on each count of conviction, the district court would have been required to impose the same 151-month sentence — that was the low end — by stacking under 5G1.2D, which governs sentencing on multiple counts of conviction. Under that guideline provision, the district court would have been required to impose consecutive sentences up to the point of the total punishment, which is the minimum sentence in the guideline range. And so I think Archdale is the only case that directly addresses total punishment. Menor specifically applied that. Again, it was not the particular holding of that case, but it specifically applied that same definition. And again, the government simply wants this court to use as precedent cases in which this question was never raised. From an institutional standpoint, what's your advice to our court? Because you have Archdale that you relied on quite reasonably, but then we also have Jetski and that whole line of cases. What should we do so far as the bar is concerned? To clarify the issue here, I think the proper thing to do in this case is to affirm the district court's sentence. In this case, cite Archdale, cite Menor, and continue on with the current state of the law in this circuit. Yeah, but if we have to say something about Jetski, which the government relies on, what do we say about it? I would say that Jetski simply – first of all, in Jetski, the appellant challenged the fact that his sentence was above the five-year maximum in that case, did not address at all this total punishment issue. And I would say that Jetski simply addressed 5G 1.2 in a different context, and the cases that have addressed 5G 1.2 in this particular context agree with the district court. So you're saying there is no conflict in these cases? Exactly. They can all be harmonized. Yes, sir. And that's what they say, too. So we'll try to figure it out. Thank you very much. Thank you for the argument on both sides. I repeat Judge McEwen's thank you, and thank counsel. The case just argued will be submitted for decision, and Judge Hall, I take it you are still with us? Still with you. Okay. We will adjourn for the morning, and we will, with Judge Hall, have our conference immediately following our adjournment. Thank you, counsel.
judges: Hall, O'scannlain, McKeown